01

02

03

04

05 UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
06 AT SEATTLE

07 SCOTT STENBERG,           )   CASE NO. C07-1819-MJP-MAT
                                   )
08      Plaintiff,           )
                                   )
09      v.                  )   REPORT AND RECOMMENDATION
                                 )   RE: SOCIAL SECURITY
10 MICHAEL J. ASTRUE,       )   DISABILITY APPEAL
Commissioner of Social Security,   )
11                                    )
     Defendant.         )
12 _____ )

13      Plaintiff Scott Stenberg proceeds through counsel in his appeal of a final decision of the

14 Commissioner of the Social Security Administration (Commissioner). The Commissioner denied

15 plaintiff's application for Disability Insurance (DI) benefits after a hearing before an Administrative

16 Law Judge (ALJ). Having considered the ALJ's decision, the administrative record (AR), all

17 memoranda of record, and oral argument held on July 15, 2008, the Court recommends that this

18 matter be REMANDED for further administrative proceedings.

19                 **FACTS AND PROCEDURAL HISTORY**

20      Plaintiff was born on XXXX, 1956.[1] He completed high school and one year of college,

21 _____

22    [1] Plaintiff's date of birth is redacted back to the year of birth in accordance with the
General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the

01 and previously worked as a charge application clerk and mechanical designer. (AR 90, 102.)

02 Plaintiff applied for DI benefits in January 2002, alleging disability beginning March 15,

03 1998. (AR 79-81.) Plaintiff remained insured for DI benefits through December 31, 2000 and,

04 therefore, was required to establish disability on or prior to that "date last insured" (DLI). *See* 20

05 C.F.R. §§ 404.131, 404.321.

06 Plaintiff's application was denied at the initial level and on reconsideration, and he timely

07 requested a hearing. On February 27, 2004, an ALJ vacated the reconsideration determination and

08 remanded the matter to the State agency for evaluation of newly-received evidence. (AR 383-84.)

09 The agency reaffirmed its prior reconsideration determination on April 29, 2004 (AR 386-87) and

10 plaintiff again timely requested a hearing.

11 ALJ Edward Nichols held a hearing on March 31, 2006, taking testimony from plaintiff

12 and vocational expert Michael Swanson. (AR 694-728.) On July 14, 2006, the ALJ issued a

13 decision finding plaintiff not disabled through the DLI. (AR 28-36.)

14 Plaintiff timely appealed. The Appeals Council denied plaintiff's request for review on

15 September 26, 2007 (AR 7-11), making the ALJ's decision the final decision of the Commissioner.

16 Plaintiff appealed this final decision of the Commissioner to this Court.

## JURISDICTION

18 The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

20 The Commissioner follows a five-step sequential evaluation process for determining

21

22 official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION RE:
SOCIAL SECURITY DISABILITY APPEAL
PAGE -2

01 whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920 (2000). At step one, it must

02 be determined whether the claimant is gainfully employed. The ALJ found plaintiff had not

03 engaged in substantial gainful activity since his alleged onset date. At step two, it must be

04 determined whether a claimant suffers from a severe impairment. The ALJ found, through the

05 DLI, plaintiff's depressive disorder severe. Step three asks whether a claimant's impairments meet

06 or equal a listed impairment. The ALJ found that plaintiff's impairments, through the DLI, did not

07 meet or equal the criteria of a listed impairment. If a claimant's impairments do not meet or equal

08 a listing, the Commissioner must assess residual functional capacity (RFC) and determine at step

09 four whether the claimant has demonstrated an inability to perform past relevant work. The ALJ

10 found plaintiff, through the DLI, to have a RFC without exertional limitations, but requiring firm

11 guidelines and low public interaction. The ALJ further found plaintiff able to perform his past

12 relevant work as charge application clerk/medical biller. If a claimant demonstrates an inability

13 to perform past relevant work, the burden shifts to the Commissioner to demonstrate at step five

14 that the claimant retains the capacity to make an adjustment to work that exists in significant levels

15 in the national economy. Finding plaintiff not disabled at step four, the ALJ did not proceed to

16 step five.

17     This Court's review of the ALJ's decision is limited to whether the decision is in

18 accordance with the law and the findings supported by substantial evidence in the record as a

19 whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Substantial evidence means more

20 than a scintilla, but less than a preponderance; it means such relevant evidence as a reasonable

21 mind might accept as adequate to support a conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750

22 (9th Cir. 1989). If there is more than one rational interpretation, one of which supports the ALJ's

01 decision, the Court must uphold that decision. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir.

02 2002).

03      Plaintiff raises a number of arguments related to Social Security Ruling (SSR) 83-20,

04 including that the ALJ erred by solely determining whether he was disabled as of the DLI instead

05 of determining his current eligibility, in failing to call a medical expert, and in failing to consider

06 various relevant factors or any evidence other than clinical and laboratory findings. Plaintiff also

07 argues that the ALJ failed to accord proper weight to treating and examining physicians and failed

08 to consider all medical reports in determining his RFC. He requests remand for further

09 consideration by the Appeals Council as to whether or not benefits can be awarded, without the

10 necessity and delay of an additional administrative hearing. The Commissioner argues that the

11 ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons

12 described below, the Court finds a remand for further administrative proceedings warranted.

13                                  <u>SSR 83-20</u>

14      The bulk of plaintiff's arguments derive from SSR 83-20, which states the policy and

15 describes the relevant evidence to consider when establishing the onset date of disability. Plaintiff

16 argues that this ruling requires an ALJ to first determine whether an individual is currently disabled

17 and, if so, to determine whether it can reasonably be inferred that the individual was disabled as

18 of the DLI. *See* SSR 83-20 ("In addition to determining that an individual is disabled, the

19 decisionmaker must also establish the onset date of disability."; "Although important to the

20 establishment of a period of disability and to the payment of benefits, the expiration of insured

21 status is not itself a consideration in determining when disability began.") He contends that the

22 ALJ erred in this case by failing to make a determination as to current eligibility and points to

01  medical evidence supporting a current eligibility finding.  (*See* Dkt. 14 at 4-8.)

02  Plaintiff next contends that, once he established his currently disabling impairment, the ALJ

03  was required to call a medical expert to assist in the determination of the onset date.  SSR 83-20

04  states:

05  In determining the date of onset of disability, the date alleged by the individual should
    be used if it is consistent with all the evidence available.  When the medical or work

06  evidence is not consistent with the allegation, additional development may be needed
    to reconcile the discrepancy.  However, the established onset date must be fixed based

07  on the facts and can never be inconsistent with the medical evidence of record.

08  . . .

09  In some cases, it may be possible, based on the medical evidence to reasonably infer
    that the onset of a disabling impairment(s) occurred some time prior to the date of the

10  first recorded medical examination, e.g., the date the claimant stopped working. How
    long the disease may be determined to have existed at a disabling level of severity

11  depends on an informed judgment of the facts in the particular case. This judgment,
    however, must have a legitimate medical basis. At the hearing, the administrative law

12  judge (ALJ) should call on the services of a medical advisor when onset must be
    inferred. If there is information in the file indicating that additional medical evidence

13  concerning  onset is available, such evidence should be secured before inferences are
    made.

14

15  The Ninth Circuit Court of Appeals has held that, where the evidence concerning onset date is not

16  definite and medical inferences must be made, SSR 83-20 requires the ALJ to obtain the services

17  of a medical expert and "to obtain all evidence which is available to make the determination."

18  *DeLorme v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991).  *Accord Morgan v. Sullivan*, 945 F.2d

19  1079, 1082 (9th Cir. 1991) (making an informed inference where the date of onset of a mental

20  impairment is ambiguous "is not possible without the assistance of a medical expert.")   In

21  *Armstrong v. Commissioner of the Soc. Sec. Admin.*, 160 F.3d 587, 589-90 (9th Cir. 1998), the

22  Ninth Circuit confirmed its ruling in *DeLorme* that the term "'should'" in SSR 83-20, in referring

01 to calling a medical expert, meant "'must.'" The Court concluded that, because it was unclear

02 when the plaintiff's various impairments in that case became disabling, the ALJ erred in failing to

03 call a medical expert to aid in determining the onset date. *Id. See also Quarles v. Barnhart*, 178

04 F. Supp. 2d 1089, 1096 (N.D. Cal. 2001) ("The ALJ in this case erred as a matter of law when

05 he did not call a medical advisor, but instead inferred, based on the dates of medical treatment, that

06 the onset date of Quarles' "currently established severe emotional disorders" was not prior to

07 Quarles' DLI.") Plaintiff maintains there is ambiguity regarding the onset date in this case and that

08 the ALJ erred in failing to call a medical expert.

09 Plaintiff further contends that the ALJ erred in failing to consider any of the multiple

10 factors required by SSR 83-20 in the determination of the onset date, including his statement as

11 to when disability began, his work history, and the medical and other evidence. He contends all

12 of these factors support an onset date prior to his DLI and were improperly ignored by the ALJ.

13 (*See* Dkt. 14 at 11-13.)

14 Finally, plaintiff argues that the ALJ erred in failing to consider any evidence other than

15 clinical and laboratory findings. SSR 83-20 recognizes the relevance of both other sources of

16 information and noncontemporaneous medical records. *See* SSR 83-20 (stating that it may "be

17 necessary to infer the onset date from the medical and other evidence that describe the history and

18 symptomatology of the disease process[,]" "to explore other sources of documentation[,]" and

19 that "[i]nformation may be obtained from family members, friends, and former employers[.]") *See*

20 *also*, *e.g.*, *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 548 (3d Cir. 2003) ("Lay evidence need

21 not be corroborated by contemporaneous medical evidence to be credible."); *Ivy v. Sullivan*, 898

22 F.2d 1045, 1049 (5th Cir. 1990) (noncontemporaneous medical records are relevant to onset

01 determination). Plaintiff asserts that the ALJ erred to the extent he required the onset date to be

02 proven by medical evidence of an objective nature, and points to evidence in the record supporting

03 an onset date prior to his DLI. (*See* Dkt. 14 at 15-18.)

04       The Commissioner asserts that the ALJ properly focused his inquiry in this DI case on

05 whether plaintiff established that he became disabled on or before the DLI. He avers that, because

06 plaintiff was not eligible for benefits if disabled after that date, the ALJ had no obligation to

07 determine whether plaintiff was disabled after his DLI.

08       The Commissioner further rejects the applicability of SSR 83-20 to this case, asserting

09 there was no need for the ALJ to infer an onset date because plaintiff did not establish he was

10 disabled. *See* SSR 83-20 (discussing inferring an onset date to establish "the precise date an

11 impairment became disabling"); *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir. 1995) ("Because the

12 ALJ found that Crane could have returned to his prior work and was not disabled, the judge

13 needed no medical expert to determine the onset date of the alleged disability.") *See also Scheck*

14 *v. Barnhart*, 357 F.3d 697, 701-02 (7th Cir. 2004) ("SSR 83-20 addresses the situation in which

15 an administrative law judge makes a finding that an individual is disabled as of an application date

16 and the question arises as to whether the disability arose at an earlier time. The ALJ did not find

17 that Scheck was disabled, and therefore, there was no need to find an onset date. In short, SSR

18 83-20 does not apply.") (internal citations omitted); *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir.

19 1997) (also concluding SSR 83-20 did not apply: "Since there was no finding that the claimant

20 is disabled as a result of his mental impairment or any other impairments or combination thereof,

21 no inquiry into onset date is required. The only necessary inquiry is whether the claimant was

22 disabled prior to the expiration of his insured status, and we agree that the ALJ correctly

01 determined he was not.")[2]

02        Plaintiff fails to adequately support his position that SSR 83-20 requires a finding as to

03 current eligibility in every case. An application for DI benefits alone, as opposed to DI *and*

04 Supplemental Security Income (SSI) benefits, limits the inquiry to whether or not an individual

05 was disabled on or prior to his DLI. *Compare Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir.

06 2005) ("Because Burch was only insured for disability benefits through September 30, 1999, she

07 must establish a disability on or prior to that date."), *with Armstrong*, 160 F.3d at 589-90 (ALJ

08 was required to call a medical expert where disability was already established for SSI benefits and

09 ALJ had to infer onset to determine DI eligibility in light of DLI). As a general rule, therefore, it

10 cannot be said that the ALJ in a DI case has a duty per se to consider whether a claimant was

11 disabled as of a later date. *See, e.g.*, *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (in

12 affirming ALJ's rejection of DI claimant's testimony as to her physical condition during the

13 eligibility period, the court noted that "'any deterioration in her condition subsequent to [the

14 period of eligibility] is, of course, irrelevant[.]'") (quoting *Waters v. Gardner*, 452 F.2d 855, 858

15 (9th Cir. 1971)). However, if the ALJ for some reason found the evidence to support disability

16 at a later date, SSR 83-20 may well come into play. For example, in *DeLorme*, 924 F.2d at 847-

17 48, the Ninth Circuit applied SSR 83-20 upon concluding that a psychiatrist's report dated after

18 a claimant's DLI showed the claimant met the criteria for a listing at step three.

19        In this case, the ALJ considered evidence dated both before and after plaintiff's DLI. After

20 ―――――――――――

21     [2] A case cited by plaintiff also provides support for the Commissioner's position. *See Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997) ("SSR 83-20 addresses the situation in

22 which an administrative law judge makes a finding that an individual is disabled as of an application date, and the question arises whether the disability arose at an earlier time.")

01 discussing all of the evidence, he stated: "These reports suggest that the claimant has some

02 limitations, but not to the point of disability." (AR 34.) Accordingly, the ALJ appeared to have

03 at least considered, but declined to find disability at a later date.

04        The ALJ does repeatedly discount evidence dated after plaintiff's DLI based, in part, on

05 its timing. (*See*, *e.g.*, AR 32 (stating that, while later counseling reports suggested much greater

06 limitations, they were prepared in 2003, "long after the date relevant to this matter.")) As stated

07 by the Ninth Circuit: "We think it is clear that reports containing observations made after the

08 period for disability are relevant to assess the claimant's disability. It is obvious that medical

09 reports are inevitably rendered retrospectively and should not be disregarded solely on that basis."

10 *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988) (internal citations omitted). Although the

11 ALJ in this case may have overstated the point by indicating that later evidence was not "relevant,"

12 he did not reject that evidence based solely on its timing. Also, it should be noted that the later

13 evidence supportive of plaintiff's claim, excluding a report submitted to the Appeals Council, does

14 not contain opinions retrospective to the time period before plaintiff's DLI.

15        In sum, plaintiff fails to demonstrate that the ALJ erred by failing to call a medical expert

16 in this case, or in otherwise failing to follow the criteria described in SSR 83-20. However, as

17 discussed below, the decision does contain a number of errors in the assessment of the medical

18 evidence. Moreover, it is possible that a reassessment of that evidence may implicate SSR 83-20

19 on remand. *See*, *e.g.*, *DeLorme*, 924 F.2d at 847-48.

20 <u>Review of Medical and Other Evidence</u>

21        Plaintiff challenges the ALJ's assessment of the evidence dated both prior to and after his

22 DLI. Those assessments are considered separately below. Plaintiff also argues that the ALJ's

01 failures in considering the medical evidence implicates the RFC finding.

02 This discussion incorporates plaintiff's arguments concerning the consideration of her

03 physicians' opinions. In general, more weight should be given to the opinion of a treating

04 physician than to a non-treating physician, and more weight to the opinion of an examining

05 physician than to a non-examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).

06 Where not contradicted by another physician, a treating or examining physician's opinion may be

07 rejected only for "'clear and convincing'" reasons. *Id.* (quoting *Baxter v. Sullivan*, 923 F.2d 1391,

08 1396 (9th Cir. 1991)). Where contradicted, a treating or examining physician's opinion may not

09 be rejected without "'specific and legitimate reasons' supported by substantial evidence in the

10 record for so doing." *Id*. at 830-31 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.

11 1983)).

12 The discussion also considers the assessment of non-physicians' opinions. In evaluating

13 the weight to be given to the opinion of medical providers, Social Security regulations distinguish

14 between "acceptable medical sources" and "other sources." Acceptable medical sources include,

15 for example, licensed physicians and psychologists, while other non-specified medical providers

16 are considered "other sources." 20 C.F.R. §§ 404.1513(a) and (e), 416.913(a) and (e), and SSR

17 06-03p. Less weight may be assigned to the opinions of other sources than acceptable medical

18 sources. *Gomez v. Chater* , 74 F.3d 967, 970 (9th Cir. 1996). However, "[s]ince there is a

19 requirement to consider all relevant evidence in an individual's case record," the ALJ's decision

20 "should reflect the consideration of opinions from medical sources who are not 'acceptable

21 medical sources' and from 'non-medical sources' who have seen the claimant in their professional

22 capacity." SSR 06-03p. "[T]he adjudicator generally should explain the weight given to opinions

01 from these 'other sources,' or otherwise ensure that the discussion of the evidence in the

02 determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's

03 reasoning, when such opinions may have an effect on the outcome of the case." *Id*. Additionally,

04 the Ninth Circuit Court of Appeals has held that "where the ALJ's error lies in a failure to properly

05 discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the

06 error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the

07 testimony, could have reached a different disability determination." *Stout v. Commissioner, Soc.*

08 *Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006).

09 A.     Evidence Predating Plaintiff's DLI

10          The ALJ first reviewed the evidence predating plaintiff's DLI, finding as follows:

11      There are few records relevant to the time the claimant was last insured. In January
        and March 1999 a mental health counselor opined that the claimant had a depressive
12      disorder that caused marked limitations in judgement and decision-making, and
        tolerating work stresses. Other areas were only moderately imitated [sic] at most, and
13      the claimant had no difficulty with simple tasks. He was slightly improved by March
        1999. The counselor was not an acceptable medical source, and these reports were
14      prepared on a check-box form without reference to clinical findings. This assessment
        is given scant weight.
15
        The claimant was treated at Mentor Health Northwest for depression, starting in
16      1998. He was diagnosed with depression and a GAF of 50, sometimes less than 50
        and sometimes more. But his mental status functioning was intact, supporting higher
17      GAF levels. In March 2000 treating sources reported that the claimant's only
        significant problem was his difficulty with stress, sustained attention, and social
18      interaction, but he was known to have some social activities and his mentation had no
        significant problems at mental status examinations.
19
        In April 2000 Janiese Loeken, M.D., a psychiatrist with Mental Health Northwest,
20      confirmed that the claimant had a depressive disorder; she said that medication had
        not been successful, but in any event the claimant had only a moderate difficulty
21      handling work stress and pressures. He had only mild difficulty interacting with
        others, and no other limitations. This report suggests that the claimant had no
22      disabling limitations. Dr. Loeken's later reports were similar, with some changes in

his ability to manage stress. Later counseling reports suggested much greater limitations, but they were prepared in 2003, long after the date relevant to this matter.

(AR 31-32; internal citations to record omitted.)

1.   Therapist John Goldman and Dr. Robert Thompson:

Plaintiff first points to the January and March 1999 evaluations addressed by the ALJ. He notes that, while therapist John Goldman alone signed the January 1999 evaluation, the March 1999 evaluation was signed by both Goldman and Dr. Robert Thompson. (AR 359, 363.) Plaintiff asserts that the evaluations were based on medical notes found later in the file. (AR 460-77.) He avers that, pursuant to SSR 83-20, these evaluations are acceptable medical evidence upon which to infer the date of the disabling impairment.

The Commissioner notes that the evaluations reflected that they were based on Goldman's "therapeutic assessment of client" and "on client's day to day living experiences[.]" (AR 358, 362.) He asserts that Goldman gave no explanation for why plaintiff had marked limitations, supporting the ALJ's criticism that the evaluations lacked explanation. The Commissioner further argues that support for the ALJ's rejection of Goldman's opinions can be found in the opinions and reports from treating physician Dr. Janiese Loeken and plaintiff's later therapist, Peter Pretkel. (*See* Dkt. 19 at 12-13.) He does not address the addition of Dr. Thompson's signature on the March 1999 evaluation.

As argued by plaintiff, Goldman's conclusions find support in his notes (*see* AR 460-77) and, given the inclusion of Dr. Thompson's signature, the ALJ wrongly criticized the March 1999 evaluation as not coming from an acceptable medical source. Also, while the Commissioner may accurately point to contrary evidence in the record, this is a post-hoc rationalization not offered

01 by the ALJ in relation to the January and March 1999 evaluations. For these reasons, plaintiff

02 demonstrates error in the consideration of the January and March 1999 evaluations. The ALJ

03 should be directed to reconsider these evaluations on remand.

04     2. <u>Mentor Health Northwest/Dr. Janiese Loeken</u>:

05     Plaintiff next points to materials from Mentor Health Northwest[3] and treating psychiatrist

06 Dr. Janiese Loeken. He asserts the supportive nature of the therapy notes and Global Assessment

07 of Functioning (GAF) scores in general. Plaintiff notes that Dr. Loeken, in her evaluations, cited

08 plaintiff's marked depressed mood and marked social withdrawal, as well as her observation that

09 he was "a highly anxious, depressed individual whose self worth is diminished and interferes in his

10 belief in his abilities to do professional work." (AR 365-66, 369-369A, 372-73, 376-77.) He also

11 notes that, in November 2000, Dr. Loeken assessed him as markedly limited in his ability to

12 respond appropriately to and tolerate the pressures and expectations of a normal work setting.

13 (AR 373.) Plaintiff contends that Dr. Loeken's reports indicate he was unable to work due to

14 major depression and that the ALJ improperly rejected the Mentor Health Northwest records by

15 conducting his own medical analysis and concluding that plaintiff's mental functioning would

16 support higher GAF ratings. Plaintiff also takes issue with the ALJ's mention of his social

17 activities, describing them as intermittent, disruptive, and often performed alone.[4]

18 _____

19     [3] Later known as Seattle Mental Health or Sound Mental Health.

20     [4] Plaintiff argues that such activities do not transfer easily into an employment environment, *see Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996), and that "'[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social

21 activity[,]'" *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (quoting *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981)). The ALJ's findings with respect to plaintiff's activities are

22 discussed further below.

REPORT AND RECOMMENDATION RE:
SOCIAL SECURITY DISABILITY APPEAL
PAGE -13

01        In response, the Commissioner points to materials in the record supporting the ALJ's

02 assessment of the opinions of Dr. Loeken and other Mentor Health Northwest providers. (*See*

03 Dkt. 19 at 12-14.)  He acknowledges that Dr. Loeken found plaintiff markedly impaired in one

04 respect in November 2000, but notes that, one month later, plaintiff reported to Dr. Loeken that

05 he intended to finish the quarter at school and look for work.  (AR 405.)  The Commissioner

06 asserts that the ALJ properly considered the evidence from Dr. Loeken and accounted for her

07 concerns as to work stress by finding plaintiff could only perform work that involved limited public

08 contact and firm guidelines.

09        Although she did find plaintiff to suffer from a marked depressed mood and marked social

10 withdrawal, Dr. Loeken twice failed to find any functional limitations other than a mild restriction

11 on his ability to interact with others and a moderate restriction on responding to pressures and

12 expectations in a work setting.  (AR 366, 369A.)  While she later upgraded the pressures and

13 expectations restriction to marked (AR 373), the ALJ acknowledged this as a change in plaintiff's

14 ability to manage stress (AR 32).  He also, as noted by the Commissioner, fashioned some

15 restrictions in the RFC assessment that may account for Dr. Loeken's findings.  Accordingly, the

16 ALJ's assessment of Dr. Loeken's opinions withstands scrutiny.

17        On the other hand, while the brief mention of "some social activities" is neither inaccurate

18 nor problematic, plaintiff raises a legitimate concern regarding the ALJ's assessment of the other

19 pre-DLI documents from Mentor Health Northwest.  The ALJ acknowledged the supportive

20 nature of those documents, noting GAF levels reflecting serious symptoms or impairment.  *See*

21 Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 2000) (DSM-IV-TR) (GAF of

22 41 to 50 describes "'serious symptoms'" or "'any serious impairment in social, occupational, or

01 school functioning'") However, he found higher GAF levels supported by plaintiff's apparent

02 "intact" mental functioning upon examination. (AR 31.) The records repeatedly describe plaintiff's

03 depressive symptoms as marked or severe. ( *See*, *e.g.*, AR 442, 456.) Therefore, even if there

04 were no obvious problems with plaintiff's mental functioning upon examination, it would seem

05 that these depressive symptoms would appropriately account for the GAF levels. *See* DSM-IV-

06 TR 32-33 (GAF rating based on both symptom severity and level of functioning; where those

07 components are discordant, "the final GAF rating always reflects the worse of the two.") The

08 undersigned agrees with plaintiff's argument that the ALJ inappropriately conducted his own

09 medical assessment of the proper GAF levels in considering this evidence. For this reason, the

10 ALJ should also be directed to reconsider the pre-DLI records from Mentor Health Northwest

11 on remand.

12 B.     <u>Evidence Dated After Plaintiff's DLI</u>

13      The ALJ went on to review the evidence dated after plaintiff's DLI, finding as follows:

14 Beginning in 2001, the claimant has a history of group treatment at Seattle Mental
Health, with waxing and waning symptoms of self-critical thoughts, feelings of

15 worthlessness, social isolation, sleep difficulty, frustration, and lack of motivation.
In February and June 2001 his Seattle Mental counselor reported that the claimant had

16 a GAF of 48, but the counselor was not an acceptable medical source and this
assessment was not supported by a reference to clinical findings and specific

17 limitations. The GAF assessment is given scant weight.

18 In July 2001 the claimant's counselor reported that the claimant had improved mood
and that treatment would including [sic] more aggressive methods to challenge him

19 to seek employment. Indeed, his counselor thought that the claimant's improvement
would be limited if he did not get out and obtain employment, suggesting work was

20 not only feasible but also an adjunct therapy.

21 Robert Carsrud, Psy.D., examined the claimant for a consultative evaluation in April
2002. The claimant described depression with lack of initiative and social isolation,

22 and history of polysubstance abuse. He presented as slightly anxious, intense and

rigid; his mental status functioning was intact. Dr. Carsrud diagnosed a mild depressive disorder and a rule-out diagnosis of personality disorder NOS. Dr. Carsrud assessed a GAF of 48. That GAF level is not consistent with a mild disorder, however, and a "rule-out" diagnosis is guesswork, not a firm conclusion. The claimant's benign mental status examination also does not support such [sic] low GAF level. It is more in keeping with Dr. Carsrud's comment that the claimant had good fund of knowledge, memory, concentration, and fair to good reasoning and judgement. His social interaction was considered fair. Although this assessment was made more than a year after the date that the claimant was last insured, it was based on Seattle Mental Health records from 2001, and is of some relevance to the time that the claimant was insured. It is unfortunate that the Seattle Mental notes describe the claimant's subjective statements but do not include thorough mental status reports of clinical test results. Dr. Carsrud commented that the claimant's symptoms were apparently "somewhat resistant to treatment" and less severe than they were "several years ago", but that latter comment was speculative. Certainly, it is not consistent with the Mentor Health reports, which are far more relevant.

Seattle Mental counselors reported in June 2002 that the claimant's GAF was 45, but the counselors are not acceptable medical sources and they have reported that he had only "mild" depression, and that he was not disabled. Later Seattle Mental reports state that the claimant's depressive disorder is severe, but his mental status function shows only a degree of dysphoria and is otherwise fully intact. In January 2003 Kathryn Draper, ARNP, reported that the claimant had a GAF of 45; but other than some dysphoria the claimant's mental status examinations were benign. Again, these reports were prepared long after the date that the claimant was last insured; Ms. Draper did not see the claimant until March 4, 2002 and her assessments are of doubtful assistance. Nevertheless, her observations of the claimant's mental status responses and presentation do not show significant social and cognitive problems.

In January 2004 Ms. Draper prepared another functional assessment, reporting the claimant's GAF at 45, with marked limitations in social functioning, concentration, persistence and pace, and inability to function outside a structured environment. He had difficulty concentrating or thinking, psychomotor agitation, and thoughts of suicide in addition to his anhedonia, decreased energy, and feeling so worthlessness [sic]. This assessment is given very little weight. It was prepared long after the date that the claimant was last insured, and Ms. Draper did not meet the claimant until more than a year after the relevant time period. As stated before, she is not an acceptable medical source. Interestingly, she reported that the claimant had no cognitive limitations, at odds with her statement that he had "marked" limitations in concentration, persistence and pace. Indeed, she reported no functional limitations at all, even in social functioning, other than difficulty with work pressures. Turning to her notes, Ms. Draper reported the claimant as having only occasional suicidal thoughts; often he denied any suicidal ideation. He had no concentration difficulty.

Those notes do not support her assessment.

David McFarlane, Ph.D., also treated the claimant. He diagnosed a depressive disorder, dysthymia, polysubstance abuse, and avoidant personality disorder, and a GAF of 45. Sometimes the substance abuse disorder was abandoned; the reason was unexplained but this was possible [sic] because it was believed that substance abuse was in partial remission. However, the claimant's continuing mental status examinations by Ms. Draper have been the same – the claimant was stable and other than a dysphoric affect his mental status was normal. These observed mental status evaluations suggest that the claimant has no significant limitations other than some lack of motivation or persistence. In any event, all the Seattle Mental reports are based on the claimant's subjective statements and were prepared after the date that the claimant was last insured.

Ms. Kelli Kelley, a psychology intern, examined and tested the claimant in October 2005, and diagnosed depressive disorder, dysthmic disorder, personality disorder NOS, and a GAF of 45. However, these tests were done many years after the time the claimant was last insured, and were at odds with reports from 1998 to 2001. These tests are not relevant.

Darla Capetillo, Ph.D., has been a treating source at Seattle Mental. She reported in November 2005 that the claimant's impairments caused moderate to marked cognitive difficulty, and moderate difficulty in interacting with others. He had severe limitations with stress and work pressures. This was prepared on a check-box form with little explanation. Dr. Capetillo reported that the claimant was very intelligent but his cognitive problems were due to concentration difficulty and lack of energy, motivation, and self-expectation. Social restrictions were due to his withdrawal from others for rear [sic] of being seen as incompetent, and his lack of energy for interaction. His impairments caused marked difficulty with social interaction, concentration, persistence and pace; there were no other limitations; she also noted that he would meet the "C" criteria due to inability to function outside a highly supporting living arrangement. This report is considered, but Dr. Capetillo did not meet the claimant until September 2005, much later than the date that the claimant was last insured. Interestingly, Dr. Capetillo helped the claimant try to design a plan to return to work, and she suggested some type of volunteer work as an entry. The gist of treatment sessions was that the claimant had low energy and a very negative self-image, but the claimant's reported activities are not consistent with that. For all these reasons, Dr. Capetillo's reports are of little benefit.

The claimant's file was reviewed by the State Disability Determination Service (DDS). In April and July 2002 DDS psychologists determined that the claimant had insufficient evidence of a mental impairment during the relevant time period. That report has some support due to the lack of relevant medical records. However, that

01  assessment was prepared without access to the Seattle Mental Health reports.

02  In April 2004 another DDS reviewer concluded that there was insufficient evidence
    of a severe mental impairment prior to December 14, 1998. Thereafter, the claimant
03  had a depressive disorder that caused moderate limitations in social functioning,
    concentration, persistence, and pace. There were no episodes of decompensation and
04  insufficient evidence of difficulty with daily activities. The claimant's condition did
    not meet the "B" or "C" criteria of any listing. More specifically, the claimant
05  retained the capacity to sustain work with only moderate limitations in concentration;
    there were no difficulties with simple tasks. He would have some difficulty interacting
06  with the public and with supervisors. He might be somewhat slower in adjustment to
    work changes, but he could adapt to changes within normal workplace tolerances.
07  There were no other limitations. This assessment is a bit vague, but has some support
    in the record. However, the claimant's ongoing computer work, up to 6 hours a day,
08  does not support any extensive limitation in concentration, persistence and pace.

09  These reports suggest that the claimant has some limitations, but not to the point of
    disability. . . .

10

11  (AR 32-34.)

12      Plaintiff argues that, from the beginning, the ALJ determined that his current disability was

13  not material to the decision. He asserts that, had the ALJ made a determination as to current

14  eligibility, there would be no question he would be found disabled. The Commissioner responds

15  that the ALJ appropriately noted that the physicians in question only gave opinions about

16  plaintiff's functioning at the time he/she issued a report, and that, because the reports did not relate

17  to the relevant period, they were not probative of plaintiff's eligibility for DI benefits. *See King*

18  *v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205-06 (6th Cir. 1990) (medical evidence dated

19  six months after expiration of DLI did not diminish support for decision that claimant was not

20  disabled prior to DLI). As indicated above, plaintiff fails to demonstrate reversible error in the

21  general consideration of evidence dated after his DLI. However, the ALJ did err in his assessment

22  of specific providers, as discussed below.

REPORT AND RECOMMENDATION RE:
SOCIAL SECURITY DISABILITY APPEAL
PAGE -18

1.    Dr. Robert Carsrud:

Plaintiff first rejects the ALJ's contention that the GAF score assessed by Dr. Carsrud was inconsistent.  He notes that the GAF rating is based on both "symptom severity" and "level of functioning" and that, where those components are discordant, "the final GAF rating always reflects the worse of the two." DSM-IV-TR 32-33.   Plaintiff further rejects the ALJ's characterization of a rule-out diagnosis as a guess, stating it more accurately corresponds with a diagnosis that is tentative based on the absence of sufficient information.

The Commissioner did not directly respond to either of these arguments in his briefing.  Instead, he reiterated the ALJ's reasoning that Dr. Carsrud characterized plaintiff's depression as mild, that his social interaction was considered fair, that he had a good fund of knowledge, memory, and concentration, and fair to good reasoning, and that Dr. Carsrud's assessment that plaintiff had improved was inconsistent with the treatment notes of other providers.

Plaintiff correctly identifies the different components of the GAF rating.  However, the ALJ is right that the GAF appears inconsistent with Dr. Carsrud's findings.  Plaintiff does not point to, nor does there appear to be, evidence of symptom severity *or* functional level reflected in Dr. Carsrud's report that would support such a low GAF rating. ( *See* AR 200-01.)  If Dr. Carsrud were a treating physician, the ALJ arguably would have been obligated to contact him for clarification. 20 C.F.R. § 404.1512(e);  *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  However, Dr. Carsrud was an examining, not a treating physician.  Additionally, while plaintiff does present an accurate definition of a rule-out diagnosis, the ALJ correctly observes that this evaluation does not contain a firm conclusion as to the presence of a personality disorder.

Given all of the above, plaintiff fails to demonstrate reversible error in the ALJ's

01   consideration of the opinions of Dr. Carsrud.  However, the ALJ also contrasted Dr. Carsrud's

02   opinions with the Mentor Health Northwest reports.  Therefore, a reassessment of those earlier

03   records may implicate the assessment of Dr. Carsrud's opinions on remand.

04         2.      Seattle Mental Health Records Generally from 2001-2005:

05         Plaintiff points to the records of his continuing treatment at Seattle Mental Health[5] with

06   various therapists through the date of the hearing.  (  See AR 122-97, 207-346, 498-532.)  He

07   asserts the longitudinal consistency of these records, with a continuing GAF of approximately 50.

08   To the extent the ALJ failed to give weight to these records given the involvement of non-

09   acceptable medical sources, plaintiff stresses the relevance of the records and the ALJ's obligation

10   to consider them.  In response, the Commissioner generally argues the sufficiency of the ALJ's

11   findings with respect to these records.

12         The ALJ specifically criticizes two GAF ratings of 48 dated in February and June 2001,

13   stating they were not given by acceptable medical sources and were not supported by reference

14   to clinical findings and specific limitations.  (AR 32 (citing AR 194-95).)  Arguably, this is

15   technically correct and sufficient.  However, the documents containing these ratings reflect

16   impressions from years of therapy and unsuccessful treatment, and note specific social,

17   occupational, housing, and/or economic problems.  (AR 194-95.)

18         The ALJ also discusses specific records from 2002 and beyond.  (See AR 32-33.)  For

19   example, he points to records reflecting mild symptoms and intact mental functioning as

20   inconsistent with a June 2002 GAF rating of 45, and criticizes records from ARNP Kathryn

21

22         [5] Previously known as Mentor Health Northwest.  See supra n. 4.

01 Draper, including a GAF rating of 45 in June 2003, with evidence of benign mental status

02 examinations, the fact that they were prepared long after plaintiff's DLI, and their failure to show

03 significant social and cognitive problems. Again, the ALJ arguably provides sufficient reasoning

04 for rejecting these records. However, the undersigned notes the consistency of the GAF ratings

05 in this case and the fact that they correspond with years of therapy and unsuccessful treatment.

06 　　　　The Court is concerned that the ALJ failed to adequately consider factors relevant to the

07 Seattle Mental Health Records, such as the consistent GAF ratings and supportive treatment notes.

08 Accordingly, as with the Mentor Health Northwest records, the ALJ should reconsider the

09 treatment records from Seattle Mental Health on remand.

10 　　　　3.　　Psychology Intern Kelli Kelley and Dr. Allen Hume:

11 　　　　As reflected above, the ALJ deemed an examination by Psychology Intern Kelli Kelley not

12 relevant, stating it occurred many years after plaintiff's DLI and was at odds with reports from

13 1998 through 2001. Plaintiff notes that this evaluation was co-signed by Dr. Allen Hume. He

14 points to the many supportive aspects of this evaluation and asserts the inclusion of several

15 objective tests demonstrating his inability to work. (*See* AR 535-39.)

16 　　　　The Commissioner notes that Kelley and Dr. Hume examined plaintiff five years after the

17 DLI and asserts that the report focused on plaintiff's functioning at the time of examination. (*See*,

18 *e.g.*, AR 537 (stating plaintiff "seems to be experiencing a diminished interest in most life

19 activities[.]")) The Commissioner argues that this focus supports the ALJ's conclusion that this

20 evaluation did not implicate plaintiff's functioning on or before his DLI. The Commissioner also

21 reiterates the ALJ's finding that this report is inconsistent with reports from the earlier time period.

22

01    The ALJ accurately noted that this report was completed many years after the DLI and it

02 does reflect findings in the present tense.  Also, the ALJ did not criticize this report as coming

03 from an "other source."

04    However, the ALJ's failure to acknowledge the involvement of an acceptable medical

05 source is concerning, particularly given the minimal discussion afforded this report.  Also, the

06 ALJ's conclusion as to inconsistency is called into doubt by errors in the consideration of earlier

07 records, as well as the consistency in GAF scores in the record.  Accordingly, the ALJ should

08 reconsider this report on remand.

09         4.    Dr. Darla V. Capetillo:

10    Plaintiff points to the supportive evaluations and treatment notes from Dr. Capetillo, his

11 treating therapist.  (*See* AR 540-78.)  In response to the ALJ's contention that Dr. Capetillo's

12 findings were not consistent with plaintiff's activities, plaintiff states that it is clear that his

13 treatment providers were aware of his activities, but nonetheless found him disabled and unable

14 to work.  He contends that the ALJ's reasoning with respect to Dr. Capetillo was no more than

15 conclusory and that, as of the date of the hearing, Dr. Capetillo's report supported the conclusion

16 that plaintiff met the criteria for a listed impairment.  (*See* AR 548 (March 2006 questionnaire by

17 Dr. Capetillo finding plaintiff to be markedly impaired in maintaining social functioning and in

18 concentration, persistence, or pace).)

19    The Commissioner responds that Dr. Capetillo provided no opinion regarding plaintiff's

20 functioning during the relevant time period, instead addressing only plaintiff's functioning in 2005

21 and 2006.  He also notes the ALJ's observation that Dr. Capetillo encouraged plaintiff to return

22 to work. (AR 33 (citing AR 576).)  The Commissioner describes this fact as contradicting Dr.

01 Capetillo's findings as to the severity of plaintiff's condition.

02         Plaintiff does not raise a distinct credibility argument. However, consideration of plaintiff's

03 arguments with respect to Dr. Capetillo requires consideration of the ALJ's findings as to

04 plaintiff's activities within the credibility assessment:

05     [The reports in the record] suggest that the claimant has some limitations, but not to
the point of disability. Other evidence supports that conclusion. The claimant

06     testified that he babysat his brother's children. He swam and worked out at the
YMCA, and his exercise gave better results than his medications. He reported

07     building a computer for his brother, and spending about 6 hours a day at a computer
terminal. He has attended movies, gone exercising, walking, hiking, canoeing,

08     building a tree house, and in May 2002 he went to a Folk Life Festival with a friend.
He enjoys swimming and he went on ski trips with family members. He visits with

09     friends. These activities suggest that the claimant has no limitations other than some
social avoidance, and a lack of motivation to disturb his leisurely lifestyle. They

10     contradict his reports that he has no enjoyment in life, no energy to do anything, no
interests, social isolation, and suicidal ideation.

11

12 (AR 34; internal citations to record omitted.) The ALJ went on to conclude that the evidence

13 suggested plaintiff's "job loss was due to business, financial, and relationship factors, not because

14 of a medical impairment." (AR 35.) He added:

15     . . . He is very active – he goes skiing, does lots of computer work, goes swimming
at the YMCA pool, hiking, skiing, and so forth. He has a group of "friends" that he

16     socializes with, such as going to festivals. He goes skiing on Mt. Hood, in Whistler,
B.C., and is apparently very active with friends and with physical activities out in

17     public and otherwise. Basically the only thing he does not do is work. While he
might be depressed, his impairment really does not bother him in terms of anhedonia,

18     social functioning, or persistence – only in motivation.

19     The claimant basically has a sinecure with his parents, which gives him the liberty to
work out and hang with his friends, all the while lacking any motivation to go to

20     work. When asked why at the hearing, the claimant really could not answer. He
seems reasonably content to have a leisurely lifestyle, occasionally babysitting his

21     brother's children without other activities outside of hiking, swimming, skiing,
freelance computer work, and so forth. The claimant is credible when he says that he

22     has no motivation, but he is not credible as to why he can't work, because he really

01    has no sufficient reason.

02  (AR 35; internal citations to record omitted.)

03      Dr. Capetillo's records do relate to the period of treatment, as opposed to containing

04  reflections on plaintiff's past abilities. Also, the ALJ appropriately pointed to plaintiff's various

05  activities as seemingly inconsistent with his alleged level of impairment.

06      However, a review of the record as a whole, including records from Dr. Capetillo, supports

07  plaintiff's contention that these providers rendered their opinions with full knowledge of his

08  various activities. (*See*, *e.g.*, AR 554-78 (Dr. Capetillo's treatment notes).) Also, the ALJ's

09  comment regarding Dr. Capetillo's suggestion as to volunteer work is not compelling. Dr.

10  Capetillo and plaintiff talked about the "possibility of volunteer work to help him in goal of getting

11  a job." (AR 576.) This does not correspond with a conclusion that Dr. Capetillo found plaintiff

12  capable of sustaining work. Finally, the ALJ's statement that Dr. Capetillo's November 2005

13  report was "prepared on a check-box form with little explanation[,]" is problematic given that the

14  report did contain explanatory statements (AR 542-43), and was accompanied by both a later

15  questionnaire, which also contained explanatory statements, and extensive treatment notes (AR

16  544-78). As such, the records from Dr. Capetillo should also be reexamined.

17      5.  <u>Dr. John Horton</u>:

18      Following the ALJ's hearing, plaintiff was examined by Dr. John Horton. (AR 662-84.)

19  Dr. Horton assessed plaintiff with affective and personality disorders, and found him to meet the

20  "B" criteria for listings 12.04 (affective disorders) and 12.08 (personality disorders), with marked

21  limitations in maintaining social functioning and in concentration, persistence, or pace, and with

22  two extended periods of decompensation. (AR 678, 681, 683.) He also rendered a retrospective

01 opinion as to plaintiff's condition, opining that the combination of plaintiff's depression and

02 personality disorder "prevented him from effectively looking for work since 1998 and prevented

03 him from working from 1998 through 2000, as well as currently." (AR 672, 676.)

04     The Appeals Council addressed Dr. Horton's report as follows:

05 We considered the psychiatric evaluation from John M. Horton, M.D., indicating the
opinion that you were not capable of working from 1998 through 2000 and it is highly

06 unlikely that you will ever be able to work. Dr. Horton indicated that you are
moderately restricted in activities of daily living. However, the record indicates that

07 you cared for your father after his stroke and care for yourself. This care is
inconsistent with a moderate restriction in activities of daily living. Dr. Horton

08 indicated that you have marked difficulties in maintaining social function and marked
difficulties in concentration, persistence, or pace. However, the decision, Page 7,

09 paragraph 4 [AR 34], summarizes evidence that shows much greater capacities. The
Council also finds no support for Dr. Horton's opinion that you have had repeated

10 episodes of decompensation, each of extended duration due to a psychological
impairment. The Council concluded that the opinion and assessment from Dr. Horton

11 is not supported by the weight of the evidence relevant to the period at issue.

12 We found that this information does not provide a basis for changing the [ALJ's]
decision.

13

14 (AR 8.)

15     Evidence submitted to the Appeals Council becomes part of the administrative record for

16 the purposes of this Court's review. *See Harman v. Apfel*, 211 F.3d 1172, 1180-81 (9th Cir.

17 2000); *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996); *Ramirez v. Shalala*, 8 F.3d 1449,

18 1451-52 (9th Cir. 1993). The Court reviews such evidence pursuant to "sentence four" of 42

19 U.S.C. § 405(g): "The court shall have power to enter, upon the pleadings and transcript of the

20 record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

21 Security, with or without remanding the cause for a rehearing." *See Anderson v. Barnhart*, No.

22 C02-2174-RSL, slip op. at 1-3 (W.D. Wash. Nov. 21, 2003) (Dkt. 26) and *Ramel v. Barnhart*,

01 No. C05-1913-RSL-MAT, slip op. at 11-14 (W.D. Wash. Aug. 4, 2006) (Dkt. 18). This Court

02 must, therefore, determine whether there is substantial evidence to support the ALJ's decision

03 even taking Dr. Horton's report into consideration.

04       Plaintiff argues that, in light of Dr. Horton's report, it is apparent that the ALJ

05 misinterpreted the various medical reports in the record and that a different result would have been

06 obtained had the ALJ called a medical expert. He describes Dr. Horton's report as providing the

07 only longitudinal perspective on all of the medical reports already in evidence. *See* SSR 96-7p

08 (discussing importance of longitudinal evidence to credibility assessment).

09       The Commissioner states that, while the Court may consider Dr. Horton's report to

10 determine whether substantial evidence exists to support the ALJ's decision, [6] it cannot award

11 benefits based on evidence the ALJ had no opportunity to evaluate. He argues that the evidence

12 from Dr. Horton does not undermine the basis of the ALJ's decision. The Commissioner describes

13 the Appeals Council's reasoning, including the fact that plaintiff cared for his elderly father after

14 his stroke and for himself, as well as plaintiff's various activities, as instructive. [7] Finally, the

---

16     [6] The Commissioner argues that the Court must look to whether the new evidence has a "reasonable possibility" of changing the ALJ's determination. However, in so doing, the

17 Commissioner relies on cases relating to "sentence six" of 42 U.S.C. § 405(g), which requires a showing of materiality and good cause for failure to incorporate new evidence into the record

18 previously, and does not apply here. (*See* Dkt. 19 at 16 (citing *Burton v. Heckler*, 724 F.2d 1415, 1417 (9th Cir. 1984); *Ward v. Schweiker*, 686 F.2d 762, 764-65 (9th Cir. 1982).)

19     [7] While arguing that the reasoning is instructive, the Commissioner maintains that the Court lacks jurisdiction to review the Appeals Council's denial of review. However, the Ninth

20 Circuit clearly assumed such jurisdiction in *Ramirez*, 8 F.3d at 1454-55 (finding that the Appeals Council erred in failing to find that the plaintiff met the requirements of a listing). While this Court

21 may not be bound by such an assumption, *see, e.g.*, *Sorenson v. Mink*, 239 F.3d 1140, 1149 (9th Cir. 2001) ("[U]nstated assumptions on non-litigated issues are not precedential holdings binding

22 future decisions."); *Estate of Magnin v. Commissioner*, 184 F.3d 1074, 1077 (9th Cir. 1999)

01 Commissioner avers that a medical opinion solicited after an unfavorable administrative decision

02 carriers little, if any, weight. *See Weetman*, 877 F.2d at 23 ("Dr. Bonneau's opinion is all the less

03 persuasive since it was obtained by Appellant only after the ALJ issued an adverse

04 determination.")

05      In reply, plaintiff takes issue with the Appeals Council's contention that Dr. Horton's

06 findings are inconsistent with his activities. He notes Dr. Horton's recognition of his activities and

07 his detailed response to the ALJ's finding on this issue. (*See* AR 669, 674-76.) For instance, Dr.

08 Horton stated:

> Judge Nichols is correct that his medical impairment did not cause the loss of either
> of those jobs, however, it was the breakup with the girlfriend in San Francisco that
> led to his current severe depression and it was his underlying severe avoidant
> personality disorder that caused him to resume not working up to this point in time.
> It is my opinion that he has more than "some social avoidance." On the contrary, he
> has been markedly socially avoidant throughout his life, with very few relationships
> outside of his immediate family and none at the current time. In interviewing Mr.
> Stenberg, there was a profound sense of lack of enjoyment of life and sadness. I do
> not think that he has been nearly as active as Judge Nichols describes in selecting out
> a few incidents where he did interact with others. If you just take the activity of
> skiing, he has only gone skiing three times in the last ten years, only when others
> organized this and only when it involved his family. In fact, he did not enjoy the
> skiing itself and did not even ski when he went to Steven's Pass and this is an activity
> he used to love and even taught when he was less depressed.

17 (AR 674-75.) Plaintiff also distinguishes *Weetman*, 877 F.2d at 23, a case relied on by the

18 Commissioner, pointing to the fact that the court in that case also noted that the physician's

19 opinion was inconsistent with earlier medical notes and that the plaintiff had performed substantial

21 ("When a case assumes a point without discussion, the case does not bind future panels."), the
Commissioner fails to identify any binding precedential authority upon which this Court could rely
22 to support his position.

REPORT AND RECOMMENDATION RE:
SOCIAL SECURITY DISABILITY APPEAL
PAGE -27

01  gainful activity.

02      While the Appeals Council points to activities arguably inconsistent with Dr. Horton's

03  findings, it does not sufficiently counter Dr. Horton's discussion of this issue, only a part of which

04  is excerpted above. Also, outside of the April 2004 report from a state agency physician (AR 478-

05  81), Dr. Horton's report does contain the only longitudinal, retrospective opinion as to disability

06  in this case. Accordingly, it is questionable whether it can be reasonably said that this report does

07  not potentially undermine the ALJ's decision. For these reasons, the ALJ should consider this

08  report on remand. The Court further recommends that, despite the inapplicability of SSR 83-20,

09  the ALJ should also call upon the services of a medical expert to obtain a second opinion on the

10  question of the longitudinal history in this case.

11                          <u>Remand</u>

12      Plaintiff requests that this case be remanded for consideration by the Appeals Council

13  without the necessity and delay of an additional administrative hearing. As reflected above, this

14  Court exercises its power of remand pursuant to sentence four of 42 U.S.C. § 405(g), allowing

15  affirmation, modification, or reversal of the Commissioner's decision with or without remanding

16  the case for a rehearing. Upon remand by this Court, the Appeals Council has the opportunity to

17  either award benefits or to set the matter for rehearing by the ALJ. The Court, therefore, should

18  simply order that this matter be remanded for further administrative proceedings.

19  / / /

20  / / /

21  / / /

22  / / /

## **CONCLUSION**

For the reasons set forth above, this matter should be remanded for further administrative proceedings.

DATED this 22nd day of July, 2008.

Mary Alice Theiler
United States Magistrate Judge

REPORT AND RECOMMENDATION RE:
SOCIAL SECURITY DISABILITY APPEAL
PAGE -29